| | |
|---|---|
| STEPHEN L. HEDRICK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     CAUSE NO.: 1:08-CV-312 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Stephen L. Hedrick appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB").[1]  (*See* Docket # 1.)  For the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Hedrick applied for DIB in September, 2004, alleging that he became disabled as of October 1, 2003. (Tr. 71-75.)  The Commissioner denied his application initially and upon reconsideration, and Hedrick requested an administrative hearing. (Tr. 45, 47, 51-52.)  Administrative Law Judge ("ALJ") Terry Miller conducted a hearing on July 26, 2007, at which Hedrick, who was represented by counsel; Mary Hedrick, the Plaintiff's wife; and Dr. Robert Barkhaus, a vocational expert ("VE") testified. (Tr. 609-50.)

On October 25, 2007, the ALJ rendered an unfavorable decision to Hedrick, concluding that he was not disabled because he could perform a significant number of jobs in the national economy despite the limitations caused by his impairments. (Tr. 17-30.)  The Appeals Council

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

denied Hedrick's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 5-16.) Hedrick filed a complaint with this Court on December 24, 2008, seeking relief from the Commissioner's final decision. (Docket # 1.) Hedrick's sole argument on appeal is that the ALJ improperly evaluated the credibility of his symptom testimony. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 13-16.)

## II. FACTUAL BACKGROUND[2]

### A. Background

Hedrick was over fifty years at the time of the ALJ's decision. (Tr. 71.) He has a tenth grade education and past work experience as an auto mechanic. (Tr. 84, 106.) Hedrick alleges that he became disabled primarily due to paroxysmal atrial fibrillation,[3] and also suffers from gastroesophageal reflux disease ("GERD"), bronchial asthma, corkscrew esophagus requiring occasional dilation, mild osteoarthritis in the left knee, chronic chest pain syndrome, mildly dilated ventricle and aortic root, grade I diastolic dysfunction/impaired relaxation of the left ventricle, mild cardiomegaly, and obesity. (Opening Br. 2-4.)

### B. Summary of Relevant Medical Evidence

On June 29, 2003, Hedrick was admitted to Marion General Hospital for atrial fibrillation and hypertension, treated with Cardizem, and released early on his own wishes. (Tr. 339.) On July 10, 2003, he saw Dr. Syed Umer to follow up and was diagnosed with paroxysmal atrial

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 650-page administrative record necessary to the decision.

[3] "Atrial fibrillation (AF) is a particular type of heartbeat (arrhythmia) characterized by an extremely fast irregular rhythm. . . . [P]aroxysmal atrial fibrillation is a common form of atrial fibrillation (40 percent of the cases) that occurs sporadically. There may be symptoms for a few minutes or hours and then a long period without any problems." (Opening Br. 2 (quoting "Health Encyclopedia - Diseases and Conditions, available online at: http://www.healthscout.com/ency/68/132/main.html).)

fibrillation, hypertension, and tobacco abuse. (Tr. 339.) Dr. Umer ordered a Cardiolite Stress Test, prescribed Lortab for pain relief, and directed Hedrick to continue taking his other medications (although Dr. Umer noted that Hedrick had not been regularly taking them). The stress test was performed on July 23, 2003, and Hedrick received abnormal results. (Tr. 374.)

Hedrick returned to Dr. Umer on August 21, 2003, for an unscheduled visit, complaining of severe pain on the left side of his chest. (Tr. 337.) He was told to take three days off from work and that if the chest pain reoccurred, a cardiac catheterization would need to be performed. (Tr. 338.)

He next saw Dr. Umer on January 6, 2004, who noted that Hedrick had been more or less stable since his August visit. (Tr. 335.) Hedrick told Dr. Umer that he had about one episode of atrial fibrillation every month, that it lasted between ten and twenty-four hours, and that it resolved itself spontaneously. (Tr. 335.) During the episodes, he experienced dizziness and fluttering palpitations, although he did not experience chest pain. (Tr. 335.) He complained of recent headaches and his diastolic blood pressure was found to be running between 100 and 106. (Tr. 335.) He did not complain of orthopnea or paroxysmal nocturnal dyspnea, although he was suffering from chronic dyspnea on exertion. (Tr. 335.)

On June 22, 2004, Hedrick was admitted to the emergency room at Marion General Hospital, complaining of a headache and respiratory difficulty. (Tr. 186.) The doctor noted that Hedrick had a history of atrial fibrillation occurring approximately once a month, with symptoms usually lasting for twenty-four hours. (Tr. 186.) An EKG was performed, which showed atrial fibrillation. (Tr. 187.) Hedrick returned to Dr. Umer on July 15, 2004, complaining of some intermittent left neck and jaw pain, but free of chest pain. (Tr. 333.) He also had noticed some

occasional irregular heartbeats, occurring approximately four to five times every day. (Tr. 333.)

Hedrick returned to Dr. Umer on August 2, 2004, as a follow-up to another recent visit to the emergency room. (Tr. 328.)  He had woken up around 1:30 a.m. with the most severe retrosternal chest pain he had ever experienced. (Tr. 328.)  He called an ambulance, but when he arrived at the hospital, the pain disappeared, so he declined admission and returned home. (Tr. 328.)  During the follow-up, Dr. Umer noted that, given Hedrick's history, this incident may have been caused by atrial fibrillation. (Tr. 328.)  Dr. Umer also noted that Hedrick had a corkscrew esophagus and that it was possible that the pain was of gastrointestinal origin, although he could not rule out cardiac pain. (Tr. 329.)  Hedrick's last echocardiogram showed left ventricular systolic ejection fraction at 50 - 55% with no significant valvular heart disease. (Tr. 329.)  A recent Holter Monitor test revealed a few isolated episodes of junctional rhythm and no definite atrial fibrillation. (Tr. 329.)  On August 27, 2004, a heart catheterization was performed and the results were normal. (Tr. 226-27.)

Hedrick was admitted to the Marion General Hospital on September 19, 2004, for paroxysmal atrial fibrillation. (Tr. 271.)  He was diagnosed with bradycardia and may have been suffering from sick sinus syndrome. (Tr. 271.)  He followed up with Dr. Umer on September 30, 2004, and stated that he continued to have recurring episodes of atrial fibrillation and was frequently dizzy, light-headed, and short of breath. (Tr. 325.)  Ablation—the isolation of pulmonary veins to prevent atrial fibrillation—was discussed and Hedrick was referred to The Heart Center of Indiana for an evaluation of whether he was a good candidate. (Tr. 623.)

On November 5, 2004, Hedrick saw Dr. Jitendra Patel, a pulmonologist and sleep apnea specialist at the Marion Lung Center. (Tr. 302.)  He complained of shortness of breath with

minimal activity, snoring, and feeling tired and fatigued during the daytime. (Tr. 302). A chest X-ray done in September, 2004, had revealed mild cardiomegaly and a pulmonary function test was normal, although a Methacholine Challenge Test was strongly positive for hyperactivity of the airways. (Tr. 302.) He was diagnosed with severe gastroesophageal reflux disease with esophageal stricture, acute and chronic dyspnea, acute exacerbation of bronchial asthma, gastro-intestinal reflux disease with esophageal stricture, and tobacco addiction. (Tr. 302.)

Hedrick saw several doctors at the Heart Center of Marion in November, 2004, complaining of shortness of breath and fatigue. (Tr. 302.) He was diagnosed with acute and chronic dyspnea, acute exacerbation of bronchial asthma, GERD syndrome with esophageal stricture, and tobacco addiction. (Tr. 302.) On April 26, 2005, he was admitted to the ER after a motorcycle fell on him and injured his left ankle. (Tr. 423-24). Similarly, Hedrick was again admitted to the ER on October 4, 2005, after a truck he was maintaining on a jack-stand fell on the left side of his chest. (Tr. 378.) An EKG showed he was in atrial fibrillation, although he declined to be admitted to the hospital. (Tr. 379.)

Hedrick returned to the ER several times in 2006, complaining of pain, shortness of breath, and atrial fibrillation. (Tr. 484, 476-77, 442.) He was seen at the Marion VA Medical Center on July 3, 2006, by Dr. Emmanuel Salud, who noted that he had been seen several times at Marion General Hospital and was not a good candidate for ablation. (Tr. 535.) He returned to the VA Medical Center on November 2, 2006, and the treating physician suggested he see a cardiologist and discuss ablation. (Tr. 531.)

Hedrick returned to Dr. Umer on February 26, 2007, complaining of intense intermittent side pain and heart palpitations. (Tr. 498.) An EKG revealed normal sinus rhythm with possible

left atrial enlargement. (Tr. 498.)  Dr. Umer diagnosed chronic chest pain syndrome and found

that he was stable from a cardiac standpoint. (Tr. 499.)  An Echocardiogram was done on March

13, 2007, which was normal, except for a mildly dilated ventricular and aortic root, mild

concentric left ventricular hypertrophy, and grade I diastolic dysfunction/impaired relaxation of

the left ventricle. (Tr. 497.)

### C. Hedrick's Hearing Testimony

Hedrick testified that he suffers from atrial fibrillation that can be brought on by stress or

physical activity. (Tr. 618.)  Hedrick stated that when his heart goes into fibrillation, his heart

rate increases, sometimes to over 200 beats per minute, he suffers from intense pain, and he

occassionally passes out. (Tr. 618.)  The experience usually lasts twenty-four hours and he

suffers from flu-like symptoms, shaking, and severe headache. (Tr. 618.)  He sometimes blacks

out and collapses, suffering further injuries. (Tr. 622.)   He also testified that, although he used to

experience this condition more frequently, for the past few years it has only been occurring every

few weeks. (Tr. 618.)

 To treat his atrial fibrillation, Hedrick testified that he uses Cardizem to slow down his

heart rate, as well as Lortab and ibuprofen for pain. (Tr. 623.)  Hedrick also recounted a visit

with a heart specialist in Indianapolis during which ablation therapy was discussed.  The doctor

did not believe Hedrick to be a good candidate for the procedure, so Hedrick resumed taking the

anti-arrhythmia drug Rythmol. (Tr. 623.)

He then testified about his other physical conditions, including mild arthritis in the left

knee, pain in the left ankle, and recurring pain in the right shoulder from a prior injury. (Tr. 618-

21.)  Hedrick stated that the shoulder pain is continuous and prevents him from lifting anything

over one pound. (Tr. 624.)  He treats his shoulder with pain medicine and he testified that he had

scheduled an MRI examination. (Tr. 625.)  Hedrick also suffers from recurring tooth infections,

esophagitis, and generalized fatigue and shortness of breath, which he believes to be caused by

the atrial fibrillation. (Tr. 618-21.)  He testified that he currently takes Lisinopril, Coreg, and

Diltiazem for high blood pressure, Coumadin as a blood thinner, Nexium for acid reflux,

Bacoflen to relax his shoulder muscles, liquid Lortab for pain relief, Klonopin and Valium to

control anxiety, and Meclizine to control his dizzy spells. (Tr. 640-41.)

Hedrick described his activities, stating that he generally stays in bed most days watching

television and that his wife takes care of many household chores. (Tr. 633-36.)  He testified that

he is able to walk half a block before his knee pain causes him to stop and that he has problems

standing for more than five or ten minutes. (Tr. 630.)  He reiterated that he is unable to lift

anything with his right arm and believed he could lift approximately ten pounds with his left

arm. (Tr. 630.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are

supported by substantial evidence, which means "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th

Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by

substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d

863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5)

whether the claimant is incapable of performing work in the national economy.[4] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On October 25, 2007, the ALJ rendered his opinion. (Tr. 20-30.) He found at step one of the five-step analysis that Hedrick had not engaged in substantial gainful activity since his alleged onset date. (Tr. 22.) At step two, he determined that Hedrick's episodes of atrial fibrillation, lightheadedness and dizziness, dyspnea, headaches, esophagitis, hypertension, and gastroesophageal disease qualified as severe impairments. (Tr. 22.) At step three, he determined that Hedrick's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 22.) Before proceeding to step four, the ALJ determined that Hedrick had the following RFC:

> [T]he claimant has the [RFC] to perform a reduced range of "light" work, as
> defined in the Social Security Administration regulations and rulings. He is able
> to lift and carry twenty pounds occasionally and ten pounds frequently. In an
> eight-hour period, the claimant is able to sit or stand/walk for a total of six hours
> each. In addition, the claimant needs to avoid exposure to hazards. He is also
> limited to performing simple, routine, repetive tasks.

---

[4] Before performing steps four and five, the ALJ must determine the claimant's Residual Functional Capacity ("RFC")—what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e).

(Tr. 22.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Hedrick could not perform his past relevant work as a mechanic. (Tr. 29.)  At step five, he concluded that there are a significant number of jobs in the national economy that Hedrick could perform, such as an assembler of small products (1000 jobs exist in the relevant region), electronics worker (500 jobs), and sales attendant (2,000 jobs). (Tr. 30.)  The ALJ also determined that even if Hedrick had to alternate between sitting and standing, he could perform work as an assembler of small products (500 jobs), an electronics worker (500 jobs), or cashier (500 jobs). (Tr. 30.)  The ALJ therefore concluded that Hedrick was not under a disability at any time from the alleged onset date through the date of the decision and his claim for DIB was denied. (Tr. 30.)

*C. The ALJ's Credibility Determination Will Not Be Disturbed.*

Hedrick asserts that the ALJ committed reversible legal error when evaluating the credibility of his symptom testimony. (Opening Br. 1.)  Specifically, he argues that the ALJ erred in giving weight to the description of his condition as "stable," in noting that he did not require specialized treatment, in discrediting his testimony because he was not compliant with his medication and failed to follow-up with his doctor, and in finding inconsistencies between the medical record and Hedrick's testimony that he had not worked on cars for three years. (Opening Br. 14-16.)  Furthermore, Hedrick argues that even if he had been working on cars, that would not be inconsistent with his testimony on the episodic incapacitation caused by the atrial fibrillation. (Opening Br. 16.)  Hedrick's arguments ultimately fall short of warranting a remand.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.

2000).  If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . .").

The ALJ took note of Hedrick's credibility throughout his decision and specifically addressed it in when making his conclusions. (Tr. 28-29.)  The ALJ devoted nearly half of his decision to a comprehensive account of Hedrick's medical history and doctor visits, noting the reasons for Hedrick's visit, the symptoms complained of, the diagnosis, and course of treatment, if any. (Tr. 24-28.)  At nearly every step, the ALJ noted that while Hedrick complained of numerous maladies and was occasionally found to be suffering from atrial fibrillation and other conditions, he was more or less found to be in average health.  For example:

Progress notes from Dr. Umer, a cardiologist, reveal that the claimant was seen from June, 2003 until November, 2004.  The claimant reported that he was in atrial fibrillation once a month and that he was also suffering from headaches.  Physical examination findings were generally within normal limits, except for high blood pressure, occasional wheezing, and a slightly prolonged expiratory phase.  A Holter Monitor study revealed that the claimant was usually in normal sinus rhythm with frequent short-lasting episodes of tachycardia.  He also had 368 isolated premature ventricular contractions.  Dr. Umer reported that the claimant was non-compliant with his medications.  An echocardiogram done in July, 2004, was found to be not significantly different from his 1999 echocardiogram.  Abnormal findings including a mildly dilated left atrium, aortic root dilation, aortic sclerosis with stenosis, an enlarged right ventricle, trivial tricuspid and pulmonary regurgitation, and thickened mitrial valve leaflets with physiological mitrial regurgitation.  However, his cardiac ejection fraction was normal. Dr. Umer concluded that the claimant's chest pain was likely of [gastrointestinal] origin from his esophageal problems (Ex. 25F).

(Tr. 26.)[5]

The ALJ also discussed the fact that the claimant's physicians often noted that he did not regularly take his medication. (Tr. 26, 28.)  Additionally, the ALJ paid special attention to the fact that, upon admission to the emergency room, the claimant was frequently described as "alert and oriented," (Tr. 24-27) and that he often checked himself out against medical advice or simply left without further treatment. (Tr. 25, 27.)  Furthermore, his condition was frequently described by several doctors as "stable" or "unremarkable." (Tr. 24-27.)  Finally, the ALJ noted four different occasions, in June, 2004, October, 2004, August, 2005, and November, 2005, when doctors remarked that the claimant often demanded narcotic pain medicine and that they believed he was engaging in drug seeking behavior. (Tr. 25-27.)

After this detailed discussion of Hedrick's claimed health problems, the ALJ concluded that his allegations were not entirely credible.  He noted the State Agency physicians' finding that Hedrick was able to lift and carry fifty pounds occasionally and twenty-five pounds frequently and that he could sit or stand and walk for a total of six hours each in an eight-hour period. (Tr. 28.)  The ALJ found no medical opinion of record to contradict this determination. (Tr. 28.)  The ALJ then specifically addressed the credibility of Hedrick's alleged conditions:

> As noted above, the claimant complained of several musculoskeletal problems, mainly in the left knee and shoulder.  However, the alleged severity was not supported in the medical evidence of record.  Thus, it seems reasonable to conclude that these impairments are not severe, or at least were not severe at any one time for a period of at least twelve consecutive months.  He has not required or undergone dilation procedures for the past few years.  In addition, with respect

---

[5] From 2003-2007, Hedrick complained of dental pain, flu symptoms, ear pain, diarrhea, sore throat, coughing, dysphagia, headaches, sinusitis, back pain, shortness of breath, rapid heart rate, lightheadedness, GERD, chest pain, groin pain, and abdominal pain. (Tr. 23-28.)  Although at different points he was diagnosed with episodes of atrial fibrillation, gastrointestinal disorder, dyspnea, obesity, tobacco addiction, and other maladies, his condition was most frequently described as "stable" and "unremarkable," with high blood pressure being the most consistent diagnosis. (Tr. 23-28.)

to his primary atrial fibrillation problems, the overall treatment records show that, despite some occasional episodes of atrial fibrillation, overall, his cardiac condition was fairly stable and did not require ongoing specialized treatment. In particular, the undersigned specifically notes a comment in a report dated February 26, 2007, contained in Exhibit 35F, p.2, by the claimant's treating cardiologist, Dr. Umer, who noted that the claimant was last seen in his office, in November 2004, and that, thereafter the claimant was lost to followup. Dr. Umer's records also indicate that the claimant was not always compliant with his medication. This appears to show that the claimant has not required specialized cardiology treatment, other than occasionally going to the emergency room for his episodes of atrial fibrillation, in order to correct his sinus rhythm, as noted in treatment records.

(Tr. 28.)

The ALJ also noted that although Hedrick had denied working on cars during the last three years, emergency room records showed that he had been admitted in connection with injuries sustained while performing maintenance on cars and motorcycles during that period. (Tr. 378, 423-24.) "This activity would clearly dispute the claimant's allegations of fairly frequent episodes of heart problems (which he described as 'flu-like symptoms'), and the alleged inability to lift only one pound with his right dominant hand." (Tr. 28.) Finally, the ALJ considered the claimant's behavior during the hearing, highlighting that he walked into the hearing room fairly briskly and with no hesitation and that he sat throughout the one-hour hearing in no apparent discomfort. (Tr. 29.)

Yet, this comprehensive analysis does not deter Hedrick from challenging the ALJ's reasoning. Hedrick first contends that the ALJ erred in giving weight to the description of his condition as "stable," citing *Micus v. Bowen*, 979 F.2d 602, 606 (7th Cir. 1992) (Court of Appeals found error in ALJ's discrediting claimant because she often told doctors she "felt good") and *Hutsell v. Massanari*, 259 F.3d 707, 713 (8th Cir. 2001) ("We also believe that the Commissioner erroneously relied too heavily on indications in the medical record that Hutsell

was 'doing well,' because doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity) in support. (Opening Br. 14.) Hedrick essentially argues that he was not "stable" in the sense of free of illness, but rather "stable at a disabling level." (Opening Br. 14.) "Stable" "is evidence that the claimant's medical condition was fixed at its level of severity and that the claimant was 'doing well' or 'stable' given the claimant's medical condition." (Opening Br. 14.)

The Commissioner responds that Hedrick was never described by a doctor as disabled, nor subject to limitations as significant as he alleged. (Mem. in Supp. of the Commissioner's Decision ("Mem. in Supp.") 5.) The Commissioner also argues that the "ALJ reasonably considered the entirety of Dr. Umer's reports, including but not limited to his consistent description of Plaintiff as 'stable from a cardiac standpoint'" and that "Dr. Umer reported that tests consistently yielded normal or only mildly abnormal results." (Mem. in Supp. 5.)

The ALJ devoted a significant portion of his decision to tracing Hedrick's medical history, describing Hedrick's alleged symptoms, the tests performed and their results, the diagnoses, and courses of treatment. (Tr. 24-28.) He frequently took note of the fact that despite Hedrick's range of complaints, and although Hedrick's physicians did occasionally find he was suffering from atrial fibrillation, his condition was generally described as "unremarkable" and "stable." (Tr. 24-28.)[6] Perhaps most tellingly, Dr. Umer, Hedrick's treating cardiologist, described his condition as "stable *from a cardiac standpoint*," in February, 2007, a nuance that the ALJ noted in his decision but Hedrick neglects to mention. (Tr. 28) (emphasis added.)

---

[6] For example: "In August 2004, the claimant was hospitalized overnight for chest pain and shortness of breath. His blood pressure was elevated but his pulse was normal, as were his EKG and cardiac enzymes. He was noted to be clinically stable." (Tr. 25.)

Although the meaning of "stable," on its own, could be ambiguous, the ALJ did not simply interpret stable as "free of illness" and conclude that Hedrick's testimony was not credible. Nor did he just rely on the "stable" description as the only basis for finding Hedrick non-credible. Rather, he drew "an accurate and logical bridge," *Shramek*, 226 F.3d at 811, between the substantial evidence of Hedrick's three year medical history of generally normal or slightly abnormal test results, combined with the frequent descriptions of his condition as "unremarkable" and "stable," in ultimately concluding that Hedrick's testimony of crippling illness and severe pain was not entirely credible. (*See* Tr. 28.) This reasoning cannot be said to be "patently wrong," *Powers*, 207 F.3d at 435, and the Court will not re-weigh the evidence in the hope that it will come out in Hedrick's favor this time. *See Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 447 (7th Cir. 2004); SSR 96-7p.

Furthermore, the instant case is distinguishable from both *Micus* and *Hutsell*. In *Micus*, the Court of Appeals found the ALJ had committed error by discrediting the claimant's credibility after she frequently told her doctors she "felt good," despite the fact she had been consistently diagnosed with several serious illnesses. *Micus*, 979 F.2d 606. In this case, however, the ALJ did not discredit Hedrick because of any statements he made that he was "stable," but rather because of his *treating physicians'* frequent description of him as stable and unremarkable, combined with the frequently normal or only slightly abnormal test results. Additionally, in *Hutsell* (which is not controlling law), the ALJ found the claimant, a woman who was undisputedly suffering from schizophrenia, had not been discharged from her treatment by her doctors, required regular follow-ups, and had frequently been described as having seriously deficient work skills, to be non-credible because her doctors indicated she was "doing

well." *Hutsell*, 259 F.3d at 712-13. The Court of Appeals found that "doing well" meant doing well *as a chronic schizophrenic* and held that the ALJ erred by finding her non-credible. *Id.* In the present case, however, there is no history of consistent diagnoses, Hedrick is not under close care and supervision by a doctor, and his doctors have never described his work skills as "seriously deficient." *Id.* It is far from clear, as Hedrick argues, that his doctors were using "stable" to mean "stable at a disabling level" and it was therefore not "patently wrong," *Powers*, 207 F.3d at 435, for the ALJ to conclude that the description of Hedrick's health as "stable" and "unremarkable" indicated his condition was not as serious as he testified.

Hedrick also takes issue with the ALJ's conclusion that he did not require specialized treatment. Hedrick points out that he was referred to the Heart Center of Indiana by Dr. Umer and, although a report of that consultation is not in the record, they found he was not a good candidate for ablation. (Tr. 326). He argues that "when the ALJ uses the failure to follow and/or seek treatment, he has the duty to inquire at the hearing and review the record for contrary evidence." (Pl.'s Reply Br. 3.) The ALJ, however, did meet his duty of inquiry. During Hedrick's testimony, the ALJ discussed the one visit to a specialist and the possible ablation therapy with Hedrick (Tr. 623-24) and specifically noted in his decision that "[Hedrick] was told three years ago that he was not a good candidate for ablation therapy because he had a 60% chance of dying during the operation." (Tr. 23.) Hedrick's argument therefore seems to simply be that the ALJ improperly weighed the evidence against him. Though Hedrick may disagree with the ultimate weighing of the evidence, such disagreement is not a basis for remand. *See Young v. Barnhart*, 362 F.3d 995,1001 (7th Cir. 2004); *Flener*, 361 F.3d at 447; *Powers*, 207 F.3d at 435.

Hedrick next objects that the ALJ improperly disregarded his testimony because he was not always compliant with his medication and was lost to follow-up. (Opening Br. 15.) He argues that "[u]nder SSR 96-7p the ALJ [m]ust not draw any adverse inferences about a claimant's symptoms and their functional effects from a failure to seek or pursue medical treatment without first considering any explanations that the individual may provide, or other information in the case record that may provide an explanation." (Opening Br. 15.) Specifically, he alleges that the ALJ failed to mention Hedrick's two reasons for not following his medication regime and not following up with his physicians or seeking further treatment: he had no medical insurance and could not afford extensive testing and he did not undergo ablation because he was not a good candidate for success. (Opening Br. 15-16.) Hedrick compares his case to *Craft v. Astrue*, 539 F.3d 668, 678-79 (7th Cir. 2008), in which the Seventh Circuit Court of Appeals held that an ALJ erred where she "drew a negative inference as to [the claimant's] credibility from his lack of medical care, [but] she neither questioned him about his lack of treatment or medicine noncompliance during that period, nor did she note that a number of medical records reflected that [the claimant] had reported an inability to pay for regular treatment and medicine."

The ALJ is entitled to consider Hedrick's failure to seek treatment, taking any explanations into consideration, when making the credibility determination. *See* 20 C.F.R. § 404.1529; *Sienkiewicz v. Barnhart*, 409 F.3d 798, 803-04 (7th Cir. 2005); *Smith v. Apfel*, 231 F.3d 433, 440 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994) (considering claimant's failure to seek medical treatment and use of only sporadic pain medication when discounting claimant's complaints of severe pain); SSR 96-7p.

As discussed above, the ALJ's opinion and the hearing transcript show that he was indeed aware of Hedrick's reason he did not seek further specialized care (that he was not a good candidate for ablation therapy) when he made his credibility determination. Hedrick's argument that the ALJ "did not mention [the failure to seek specialized treatment and ablation therapy] in his decision," (Opening Br. 16) is simply not true. Rather, the ALJ was clearly aware of Hedrick's offered reason for why he failed to seek further specialized care and incorporated it in his overall credibility determination. (*See* Tr. 23, 623-24.) In the absence of legal error or a "patently wrong" decision, the Court will not remand the case simply in hopes that a new ALJ will view the same evidence in a different light. *See Young*, 362 F.3d at 1001; *Flener*, 361 F.3d at 447; *Powers*, 207 F.3d at 435.

Hedrick also argues that the ALJ improperly discounted his credibility by failing to consider his other reason for being out of compliance and not seeking additional medical treatment; his lack of medical insurance and inability to afford care. (Opening Br. 15.) "There is evidence in the record that he had no medical insurance and could not afford an extensive workup when he was in the emergency room on April 20, 2004." (Opening Br. 15.) "The ALJ did not mention [his lack of insurance and financial condition] in his decision. . . ." (Opening Br. 16.) Plaintiff's argument is simply not supported by the record. In his decision, the ALJ clearly stated that: "[Hedrick] also reported prior to the hearing that he does not always get the treatment he needs due to lack of medical insurance (Ex. 2E, 4E, 5E, 9E)." (Tr. 24.) In addition to directly mentioning this reason, the ALJ also apparently examined the medical records in which Hedrick indicated he lacked insurance after the hearing, as he directly cites to them in his decision. (Tr. 24.) Furthermore, Hedrick, who was represented by counsel at the hearing, *see*

18

*Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987) (articulating that when a claimant is represented by counsel an ALJ "is entitled to assume that the applicant is making his strongest case for benefits"), did not directly introduce evidence of his inability to pay, apparently only once referring to this before the hearing began. (Tr. 24.) It cannot be said, therefore, that the ALJ failed in his duty of inquiry by not considering this reason why Hedrick may have failed to seek treatment.

The present case is plainly distinguishable from *Craft*, where the Court of Appeals gave weight to the ALJ's failure to question the claimant about his lack of treatment or note that a number of medical records indicated the claimant could not pay for regular treatment and medication. *Craft*, 539 F.3d at 679. As noted previously, the ALJ discussed Hedrick's reasons for failing to seek treatment during the hearing and specifically mentioned them in his decision. (*See* Tr. 23, 24, 623-24.) Since the ALJ's decision is grounded in the record and he articulated his analysis of the evidence "at least at a minimum level," *Ray*, 843 F.2d at 1002, his decision will not be disturbed. *See Stevenson v. Chater*, 105 F.3d 1151, 1155 (7th Cir. 1997) (stating that an ALJ is entitled to make reasonable inferences from the evidence of record); *Young*, 362 F.3d at 1001; *Flener*, 361 F.3d at 447; *Powers*, 207 F.3d at 435.

Hedrick next claims that there was no significant inconsistency between his testimony at the 2007 hearing that he had not worked on other's vehicles for three years and his own for two years and medical records showing he was twice admitted to the emergency room in 2005 for injuries sustained by a motorcycle and car he was maintaining. (Opening Br. 16.) "In regard to the motorcycle falling on his ankle, there is no indication he was working on it; however, even if he was, it was more than two years prior to his hearing testimony which indicated that he had

stopped [working] on his own vehicles in the last two years. The incident in October was just one year and nine months before the hearing, and is not significant enough a contradiction to discredit the testimony." (Opening Br. 16.) The Commissioner responds that although these inconsistencies, on their own, would likely be insufficient to find Hedrick non-credible, they were but one of several relevant factors the ALJ considered in making his determination. (Mem. in Supp. 8.)

The Commissioner's argument has merit. The ALJ did not base his credibility decision solely on inconsistencies between Hedrick's testimony and his medical records about when he may have been working on motor vehicles. Rather, these statements were combined with an extensive examination of Hedrick's medical history, his failure to follow up with his doctors or seek further treatment, consistently normal or only slightly abnormal test results, the frequent description of his condition as "stable" or "unremarkable," the findings of the State Agency physicians, and observation of Hedrick during the hearing. (Tr. 24-29.) *See Stevenson*, 105 F.3d at 1155; *Luna,* 22 F.3d at 691. Given that the ALJ is in the best position to evaluate the credibility of a witness, the Court gives special deference to his determination. *Powers,* 207 F.3d at 435. The ALJ's combined reasons for finding Hedrick non-credible cannot be said to be "patently wrong," *Id.*, and the Court will not remand his decision simply because Hedrick hopes that a new ALJ will reach a different conclusion.

Finally, Hedrick argues that, even if he were working on vehicles, that would not be inconsistent with his testimony on the episodic incapacitation caused by the atrial fibrillation. (Opening Br. 16.) "Although [Hedrick] may be able to sustain work for significant periods of time, the severity and frequency of the episodes is what prevents him from performing

20

competitive work on a sustained basis." (Opening Br. 16.)  As noted above, however, the ALJ did not just base his credibility determination on Hedrick's testimony that he had stopped working on motor vehicles.  Rather, this testimony was but one part of the ALJ's overall credibility determination. (*See* Tr. 24-29.)  As such, the ALJ's decision will not be overturned in hopes that a different ALJ will view the same evidence in a new light.

In sum, the Court will not accept Hedrick's plea to re-weigh the evidence in the hope that it will come out in his favor a second time. *See Flener*, 361 F.3d at 447.  The ALJ has built an accurate and logical bridge between the evidence and his conclusion, *see Ribaudo*, 458 F.3d at 584, and his conclusion is not "patently wrong," *Powers*, 207 F.3d at 435.  Therefore, the ALJ's credibility determination, which is entitled to special deference, *id.*, will not be disturbed.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Hedrick.

SO ORDERED.

Enter for this 6th day of October, 2009.

S/Roger B. Cosbey_____
Roger B. Cosbey,
United States Magistrate Judge